## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AMANDA BOSTER, Derivatively on Behalf of Nominal Defendant DUTCH BROS INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| JONATHAN RICCI, CHARLES L. JEMLEY, BRIAN MAXWELL, TRAVIS BOERSMA, SHELLEY BROADER, THOMAS DAVIS, CHARLES ESSERMAN, KATHRYN GEORGE, STEPHEN GILLETT, and BLYTHE JACK, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| DUTCH BROS INC., | ) ) | |
| Nominal Defendant. | ) | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Amanda Boster ("Plaintiff"), by and through her undersigned counsel, alleges the following based upon personal knowledge as to matters concerning herself, and upon information and belief as to all others based on, *inter alia*, the investigation of counsel, which includes review and analyses of: (a) the filings of Dutch Bros Inc. ("Dutch Bros" or the "Company") with the United States Securities and Exchange Commission ("SEC"), (b) news articles, press releases, conference call transcripts, analysts' reports, and other publicly available information concerning the Company, and (c) the pleadings, Orders, and filings in the securities class action litigation captioned, *Peacock v. Dutch Bros Inc.*, Case No. 1:23-cv-01794 (S.D.N.Y.) (the "Securities Action").

## NATURE OF THE ACTION

1.      This stockholder derivative action is brought on behalf of Dutch Bros against certain current and former Company officers and members of the Company's Board of Directors (the "Board") for breaches of their fiduciary duties in issuing, causing to be issued, or permitting the issuance of materially false and misleading public statements concerning the Company's business, operations, and prospects, during the period of March 1, 2022 to May 11, 2022 (the "Relevant Period").

2.      Founded in 1992, Dutch Bros is a high growth operator and franchisor of drive-thru coffee shops that focus on serving high quality, hand-crafted beverages. The Company is one of the fastest-growing brands in the food service and restaurant industry in the United States by location count, with 671 shops located across fourteen states as of December 31, 2022.

3.      As set forth below, throughout the Relevant Period, the Individual Defendants (defined below) and the Company misled the investing public, including the Company's shareholders, by misrepresenting the business operations and financial success of the Company.

4.      On March 1, 2022, the Company issued a press release announcing its fourth quarter and full year 2021 financial results (the "4Q21 Press Release"). The 4Q21 Press Release stated, in relevant part:

> Joth Ricci, Chief Executive Officer and President of Dutch Bros Inc., stated, "2021 was a fantastic year for Dutch Bros. We started the year with the launch of the brand in Texas, which was a major milestone for the Company. Led by a talented pipeline of regional operators and long-term franchise partners, unit growth accelerated to 98 new shop openings, revenue grew 52.1% and same shop sales increased 8.4%. 2021 was also the year we converted customers from a long-standing, paper-based stamp card loyalty program to the Dutch Bros app, which grew to 3.2 million members. And, this summer, the Dutch Bros story was presented to the public markets. Through all this, we delivered financial results that exceeded our expectations and kept our brand promise of speed, quality and service."

5.      In addition to the 4Q21 Press Release, Dutch Bros also held an earnings conference

call on March 1, 2022 to discuss Dutch Bros' fourth quarter and full year 2021 results (the "4Q21 Conference Call"). During the 4Q21 Conference Call, the Company's officers, including Defendants Joth Ricci ("Ricci"), the Company's Chief Executive Officer ("CEO"), and Charles Jemley ("Jemley"), the Company's Chief Financial Officer ("CFO"), made statements alleging that the Company's results for the first quarter of 2022 would be positive. Specifically, Defendant Jemley stated, in relevant part:

> We entered 2022 with a strong pipeline of new shops that fit inside our selection criteria and meet our overall growth strategy objectives to expand in existing markets and to open a select set of new markets each year. All this is designed to give our operators growth opportunities and to do so in a financially successful way. You see that optimism in our new unit guidance for 2022, grounded by both volume and profitability results, supporting our decision to quicken the pace in measured ways.
>
> As it relates to new shop profitability, our results in 2021 affirm that we are right on track. . . .

6.      Defendant Jemley ended his remarks in the 4Q21 Conference Call by stating "we are feeling good as we enter '22 with the trajectory of our margins, given everything going on."

7.      However, these statements were materially false and misleading. In reality, (a) the Company was experiencing increased costs and expenses and supply chain issues; and (b) as a result, the Company was experiencing increased margin pressure and decreased profitability in the first quarter of 2022.

8.      Then, on May 11, 2022, the truth began to emerge, when, after the market closed, Dutch Bros issued a press release announcing disappointing financial results for the first quarter of 2022 (the "1Q22 Press Release"). In the 1Q22 Press Release, the Company reported a net loss of $16.3 million for the first quarter of 2022, compared to a $4.8 million loss for the same quarter of 2021.

Case 1:23-cv-06186-PAE   Document 1   Filed 07/18/23   Page 4 of 38


9. On this news, Dutch Bros' stock price declined $9.26 per share, or approximately 27%, to close at $25.11 per share on May 12, 2022.

10. The Individual Defendants breached their fiduciary duties to Dutch Bros by making and/or causing the Company to make to the investing public a series of materially false and misleading statements about the Company's business, operations, and prospects.

11. Specifically, the Individual Defendants willfully or recklessly made and/or caused Dutch Bros to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (a) the Company was experiencing increased costs and expenses and supply chain issues; and (b) as a result, the Company was experiencing increased margin pressure and decreased profitability in the first quarter of 2022.

12. The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13. Moreover, several of the Individual Defendants further breached their fiduciary duties by engaging in lucrative insider trading of Dutch Bros common stock at artificially inflated rates. These insider sales generated proceeds in excess of $10 million.

14. As a result of the foregoing, the Securities Action was filed against the Company and Defendants Ricci and Jemley on March 1, 2023. In addition to incurring significant costs to defend itself in that action, the Securities Action has exposed the Company to massive class-wide liability.

15. In addition to the costs and expenses related to defending itself against the

Securities Action and exposing Dutch Bros to potential liability for class-wide damages, the Individual Defendants' misconduct has caused the Company to waste corporate assets and enabled the Individual Defendants who were improperly overcompensated by the Company to unjustly enrich themselves.

16.     Plaintiff did not make a demand on the Board because, as further detailed herein, the publicly available information confirm demand would be a futile and useless act. Demand is excused as to each of the directors named herein because each faces a substantial likelihood of liability.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Dutch Bros' common stock trades on the New York Stock Exchange, which is headquartered in New York, New York, and Dutch Bros conducts business in this District.

## PARTIES

*Plaintiff*

22.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Dutch Bros since September 24, 2021.

*Nominal Defendant*

23.     Nominal Defendant Dutch Bros is incorporated under the laws of Delaware with its principal executive offices located in Grants Pass, Oregon.  Dutch Bros' common stock trades on the New York Stock Exchange, which is headquartered in New York, New York, under the ticker symbol "BROS."

*Individual Defendants*

24.     Defendant Ricci has served as CEO of the Company since August 2021. Ricci previously served as the Company's President from August 2021 to February 2023. Ricci also serves as CEO of Dutch Mafia, LLC ("Dutch Bros OpCo"), a direct subsidiary of the Company, and as Chairman of the board of directors of Dutch Bros Foundation, the philanthropic arm of the Company. According to the Company's public filings, Ricci received $1,114,060 in compensation from the Company in 2022. According to the Proxy Statement filed by the Company with the SEC on April 3, 2023 (the "2023 Proxy"), Defendant Ricci owns 2,293,865 shares of the Company's common stock.

25.     Defendant Jemley has served as CFO of the Company since 2020. According to the Company's public filings, Jemley received $723,333 in compensation from the Company in 2022. According to the 2023 Proxy, Defendant Jemley owns 1,167,032 shares of the Company's common stock.

26.     Defendant Brian Maxwell ("Maxwell") has served as the Chief Operating Officer ("COO") of the Company since August 2021. Maxwell also serves as COO of Dutch Bros OpCo.

According to the Company's public filings, Maxwell received $626,159 in compensation from the Company in 2022. According to the 2023 Proxy, Defendant Maxwell owns 1,153,620 shares of the Company's common stock.

27.     Defendant Travis Boersma ("Boersma") is co-founder of the Company and has served as Executive Chairman of the Company since August 2021. Boersma also serves as Executive Chairman of Dutch Bros OpCo. According to the Company's public filings, Boersma received $1,508,989 in compensation from the Company in 2022. According to the 2023 Proxy, Defendant Boersma and his affiliated entities own 129,423,699 shares of the Company's common stock, accounting for 75.8% of the Company's combined voting power.

28.     Defendant Shelley Broader ("Broader") has served as a director of the Company since August 2021. Broader also serves as Chair of the Board's Audit and Risk Committee. According to the Company's public filings, Broader received $184,174 in compensation from the Company in 2022.

29.     Defendant Thomas Davis ("Davis") has served as a director of the Company since August 2021. Davis also serves as Chair of the Board's Compensation Committee. Furthermore, Davis serves as a member of the board of managers of Dutch Bros OpCo. According to the Company's public filings, Davis received $182,984 in compensation from the Company in 2022.

30.     Defendant Charles Esserman ("Esserman") has served as a director of the Company since August 2021. Esserman also serves as a member of the board of managers of Dutch Bros OpCo.

31.     Defendant Kathryn George ("George") has served as a director of the Company since August 2021. George also serves as a member of the Board's Audit and Risk Committee. Furthermore, George serves as a member of the board of managers of Dutch Bros OpCo.

According to the Company's public filings, George received $171,696 in compensation from the Company in 2022.

32.     Defendant Stephen Gillett ("Gillett") has served as a director of the Company since December 2021. Gillett also serves as a member of the Board's Audit and Risk Committee. According to the Company's public filings, Gillett received $180,794 in compensation from the Company in 2022.

33.     Defendant Blythe Jack ("Jack") has served as a director of the Company since August 2021. Jack also serves as a member of the Board's Compensation Committee. Furthermore, Jack serves as a member of the board of managers of Dutch Bros OpCo. According to the Company's public filings,

34.     Defendants referenced in paragraphs 24 through 33 are referred to herein as the "Individual Defendants," and, with Dutch Bros, the "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By reason of their positions as officers and directors of Dutch Bros, and because of their ability to control the business and corporate affairs of Dutch Bros, the Individual Defendants owed Dutch Bros and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Dutch Bros in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Dutch Bros and its shareholders so as to benefit all shareholders equally.

36.     Each director and officer of the Company owes to Dutch Bros and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.    The Individual Defendants, because of their positions of control and authority as officer and directors of Dutch Bros, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.    To discharge their duties, the officers and directors of Dutch Bros were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officer of Dutch Bros, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the New York Stock Exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations. The Individual Defendants also had a fiduciary duty to disclose the material information necessary to prevent other public statements, including those in its regulatory filings with the SEC, from

being materially false, so that the market price of the Company's common stock was based upon truthful, accurate, and fairly presented information.

41.     To discharge their duties, the officers and directors of Dutch Bros were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Dutch Bros were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Dutch Bros' own Code of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Dutch Bros conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Dutch Bros and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Dutch Bros' operations would comply with all applicable laws and Dutch Bros' public statements, financial statements and regulatory filings

were accurate;

(f)     adequately monitor the Company's officers and employees to ensure their public statements about the Company were complete and accurate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.     Each of the Individual Defendants further owed to Dutch Bros and its shareholders the duty of loyalty requiring that they favor the interests of Dutch Bros and its shareholders over their own while conducting the affairs of the Company, and that the Individual Defendants refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.     Because of their advisory, executive, managerial, and directorial positions with Dutch Bros, each of the Individual Defendants had access to adverse, non-public information about the Company.

44.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Dutch Bros.

### DUTCH BROS' CODE OF BUSINESS CONDUCT

45.     Dutch Bros' Code of Conduct, last updated December 5, 2022, applies to all employees, officers, and directors of the Company and all of its subsidiaries, including Dutch Bros OpCo. The Code of Conduct starts by stating:

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. Dutch Bros' integrity and reputation depends on the honesty, fairness, and integrity brought to the job by each person associated with us. Unyielding personal integrity and sound judgment is the foundation of corporate integrity.

46.     In a section titled, "Legal Compliance," the Code of Conduct states:

Obeying the law is the foundation of this code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national, and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. Violation of domestic or foreign laws, rules, and regulations may subject an individual, as well as Dutch Bros, to civil and/or criminal penalties.

47.     In a section titled "Financial Integrity," the Code of Conduct states:

The integrity of our records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, and others. We also rely upon our accounting and other business and corporate records in preparing publicly-filed reports. Securities laws require that these reports provide full, fair, accurate, timely, and understandable disclosure and fairly present our financial condition and results of operations. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate, and transparent.

48.     The Individual Defendants, as officers and directors of the Company, were required to abide by the Code of Conduct at all relevant times.

## DUTCH BROS' AUDIT AND RISK COMMITTEE CHARTER

49.     The Company's Audit and Risk Committee Charter (the "Audit Committee Charter"), last amended December 5, 2022, states that the purpose of the Audit and Finance Committee is to:

•  oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits, and the integrity of the Company's financial statements;

• manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

• maintain and foster an open avenue of communication with the Company's management, internal audit group, and Auditors;

• review any reports or disclosures required by applicable law and the New York Stock Exchange listing requirements (the "listing requirements");

• oversee the design, implementation, organization, and performance of the Company's internal audit function;

• help the Board oversee the Company's data security, information technology use and protection, and legal and regulatory compliance, including risk assessment; and

• provide regular reports and information to the Board.

50.    In a section titled "Responsibilities," the Audit Committee Charter states that the Audit Committee is responsible for, among other things:

*Financial Review and Disclosure:*

**5. Annual Audit Results.** The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

• the Auditors' assessment of the quality of the Company's accounting principles and practices;

• the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

• all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial);

• the adequacy of the disclosures in the financial statements; and

• any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

**6. Audited Financial Statement Review; Quarterly and Annual Reports.** The

Committee will review the annual audited financial statements, the quarterly financial statements, and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

**7. Earnings Announcements.** The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies.

**8. Proxy Report.** the Committee will oversee the preparation of any report of the Committee required by applicable law or the listing requirements to be included in the Company's annual proxy statement.

**9. Accounting Principles and Policies.** The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

• critical accounting policies and practices;

• alternative accounting policies available under GAAP;

• the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

• any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal-control letter, and monitor management's response to such communications. At least annually, the Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB). 10. Management Cooperation with Audit. The Committee will evaluate management's cooperation with the Auditors during their audit examination, including any significant difficulties or disagreements encountered during the audit, if any.

***Internal Control and Procedures:***

**11. Risk Assessment and Management.** The Committee will review and discuss with management and the Auditors the Company's processes and policies on

enterprise risk identification, management, and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to data privacy, technology, information security (including data-security and back-up of information systems), competition, and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.

**12. Internal Auditors.** The Committee will review the development and implementation of an internal audit function and activities of the Company's internal audit team and discuss with that team the adequacy and effectiveness of the Company's scope, staffing, and general audit approach. The Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response. The head of the internal audit function will also report to and be evaluated by the Committee.

**13. Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting, including the adequacy and effectiveness of the Company's information and cyber security policies, the internal controls regarding information security, and any significant deficiencies and significant changes in internal controls, and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

**14. Correspondence with Regulators.** The Committee will consider and review with management, the Auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies. 15. Internal Control Report. At least annually (if required by the listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal qualitycontrol review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

**16. Complaint Procedures.** The Committee will oversee procedures for receiving, retaining, and investigating the following:

• complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

• confidential and anonymous submissions by employees concerning questionable accounting or auditing matters. In addition, the Committee will oversee procedures for receiving, retaining, and investigating any "hotline" complaints or submissions delegated to the Committee by the Board.

**17. Ethical Compliance.** The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and the listing requirements, including the Company's Code of Business Conduct and Ethics. 18. Related Party Transactions. The Committee will review and approve, in accordance with the Company's policies, any related party transaction as defined by applicable law or the listing requirements. . . .

**21. Other Legal and Finance Matters.** The Committee will review with management legal and regulatory compliance, as well as any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee. The head of the Company's legal department has the authority to communicate directly with the Committee with respect to legal matters that could impact the Company's financial statements or internal controls.

51.     Defendants Broader and Gillett (the "Audit Defendants") were required to abide by the Audit Committee Charter at all relevant times.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii)

conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

54.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

55.    Each of the Individual Defendants aided, abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Dutch Bros and was at all times acting within the course and scope of such agency.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

*Background*

57.    Dutch Bros is an operator and franchiser of drive-thru coffee shops that focus on serving high quality, hand-crafted beverages. Dutch Bros specializes in espresso-based beverages

but offers a wide variety of unique, customizable cold and hot beverages.

58.     As of December 31, 2022, the Company has 671 shops, of which 396 are company-operated and 275 are franchised. The Company's shops span across fourteen states in the U.S., including Arizona, California, Colorado, Idaho, Kansas, Missouri, Nevada, New Mexico, Oklahoma, Oregon, Tennessee, Texas, Utah, and Washington.

**The Individual Defendants' False and Misleading Statements**

59.     Throughout the Relevant Period, the Individual Defendants caused and/or permitted the Company to continuously tout the financial success of Dutch Bros.

60.     On March 1, 2022, at the start of the Relevant Period, the Company reported the fourth quarter 2021 and full year 2021 financial results in the 4Q21 Press Release. Defendant Ricci was quoted in the 4Q21 Press Release as stating, in relevant part:

> In 2022, we celebrate Dutch Bros' milestone 30th anniversary, and begin our expansion east with our entrance into Nashville. While our history shows we're a well-established and respected brand, we are still in the early stages of our long-term story. Two years ago, we entered 2020 with just 370 shops in 7 states. We finished 2021 with 538 shops in 12 states. Importantly, new shops are opening at higher average unit volumes than the system average, including in new markets. In 2022, we have committed to opening at least 125 new shops, supported by a robust pipeline and strong consumer acceptance of Dutch Bros. In addition to moving east, we are excited about further expansion in existing markets, including Southern California, a market we believe will be a significant growth driver. . . .

61.     The 4Q21 Press Release also included a financial outlook for 2022. The 4Q21 Press Release touted the expected financial success for 2022, stating, in relevant part:

**Outlook**

For full year 2022, Dutch Bros is providing the following outlook:

• **Total system shop openings** are expected to be at least 125, of which at least 105 shops will be company-operated.

• **Total revenues** are projected to be in the range of $700 million to $715 million.

• **Same shop sales growth** is estimated in the mid single digits.

• **Adjusted EBITDA** is estimated to be in the range of $115 million to $120 million.

• **Capital expenditures** are estimated to be in the range of $175 million to $200 million.

For Q1 2022, Dutch Bros is providing the following outlook:

• **Total system shop openings** are expected to be at least 30, of which nearly all shops will be company-operated.

• **Same shop sales growth4** is estimated in the mid single digits.

62.     On the same day, the Company held the 4Q21 Conference Call to discuss the fourth quarter 2021 financial results. During the 4Q21 Conference Call, Defendants Ricci and Jemley discussed the Company's financial outlook for 2022. Defendant Ricci highlighted the Company's planned expansion and growth for 2022, stating, in relevant part:

> In early 2022, we opened our first shop east of the Mississippi River in Nashville, Tennessee. Throughout 2022, we will continue to expand in Texas, Oklahoma, Tennessee, and Kansas and also ramp up development in Southern California where results are pointing to a significant opportunity. In total, we now expect to open at least 125 shops, above our original guidance of at least 112. Our ability to increase our development goal for 2022 is based upon our incredibly talented pool of operators as well as our confidence in our ability to identify and secure new sites at attractive returns.

63.     Defendant Ricci went on to tout the Company's ability to stay ahead of labor shortages and inflation, stating, in relevant part:

> Staffing and labor headwinds within the overall industry are well known. We've read the headlines. While we are neither immune from market forces nor the impact of the omicron variant, our overall labor cost and ability to maintain normal operating hours were stable in the fourth quarter and now into 2022. We had less than 1% downtime during the fourth quarter.

64.     Defendant Ricci further stated, "[m]omentum has continued into the new year. Underlying consumer demand remains very positive as evidenced by our same-shop sales and

continued acceptance as we enter new markets and infill our current markets."

65.      Defendant Jemley also made numerous statements about the Company's future financial success during the 4Q21 Conference Call. Indeed, Jemley discussed the expected growth of Dutch Bros for 2022, stating "[a]t the end of the fourth quarter, we had 271 company-operated shops, nearly 50% more than we had at the end of 2020. Our overall system shop count was 538 shops or 22% more than we had at the end of 2020. ***Ahead of that objective and our guidance is 20-plus percent growth again in 2022***." (Emphasis added). Furthermore, Defendant Jemley stated:

> We entered 2022 with a strong pipeline of new shops that fit inside our selection criteria and meet our overall growth strategy objectives to expand in existing markets and to open a select set of new markets each year. All this is designed to give our operators growth opportunities and to do so in a financially successful way. You see that optimism in our new unit guidance for 2022, grounded by both volume and profitability results, supporting our decision to quicken the pace in measured ways.

66.      Defendant Jemley then went on to share the Company's anticipated financial outlook for 2022, stating, in relevant part:

> For 2022 specifically, total system shop openings are expected to be at least 125, of which at least 105 shops will be company-operated. Total revenues are projected to be in the range of $700 million to $715 million.
>
> Same-shop sales growth are estimated in the mid-single digits. Adjusted EBITDA is estimated to be in the range of $115 million to $120 million. Capital expenditures are estimated to be in the range of $175 million to $200 million, which includes approximately $15 million to $20 million for our new roasting facility that we project will open in 2023. For Q1, total shop openings are expected to be at least 30, of which nearly all shops will be company-operated.
>
> We expect approximately half of these shops to be the first shops in their respective new markets, requiring our highest level of opening support. Same-shop sales are estimated in the mid-single digits. G&A spending includes the two events Joth mentioned, in the range of $2 million to $2.5 million. As a reminder, our business is seasonal, with our best consistently high daily volumes taking place in Quarter 2.

67.      During the questions and answers portion of the 4Q21 Conference Call, an analyst

asked the Company's officers whether they would increase prices due to market changes and potential margin pressure. In response, Defendant Jemley painted a positive picture for 2022, stating:

> So we look typically in a normal time frame. We're going to look at our pricing windows every 6 months, right, in the fall before holiday, in the spring before summer. And so we're very mindful of that. ***I think we've been fortunate to not have a lot of inflation drag, both in '21 and frankly, moving into early '22.***
>
> And so we haven't felt compelled. We don't price to a margin. First of all, we want to price to what consumers are willing to pay. And so we're just -- honestly, we're flexible and we're watching that closely, but we do with the mindset of our relative position in the market and the customer not to seek to a margin level.
>
> ***But we are feeling good as we enter '22 with the trajectory of our margins, given everything going on.***

(Emphasis added).

68.    Another analyst inquired further about the margin pressure for 2022 given the increased cost of goods and services ("COGS") and labor inflation. In response, Defendant Jemley assured the analyst, and therefore all investors present, that the Company was set up for financial success, stating:

> Yes. ***So we're fortunate that the two big costs, cost of goods and labor, we don't have any real significant upward momentum in the labor line. So we're starting halfway better than everybody else, to begin with***. And then secondly, we have a pretty simple pantry of goods.
>
> What we're really dealing with right now is freight and logistics costs going up. But we're able to do, as we've shown in Q4 and the walk I gave you in COGS, we're really able to handle that pretty effectively, and we'll get a full quarter of the price impact from November in our Q1. In terms of guiding a specific margin for Q1, I'd prefer not to do that. It is a -- Q4 is the lowest seasonality, Q1 is the next lowest seasonality.
>
> And then we kind of get into Q2. But I just think from a -- other than the discount rollover from a year-over-year perspective, ***we're just not feeling compression in margins. And the biggest thing for us is our labor costs are stable.***

(Emphasis added).

69.     Lastly, an analyst asked about financial guidance for the first quarter of 2022, specifically asking "does guidance embed some level of conservatism for the quarter? Or perhaps if you can help us out, just two-thirds of the way through the first quarter, that January maybe was a little bit more soft due to omicron before bounding in February?" In response, Defendant Jemley assured the analyst, and therefore all investors, that the Company was on track, stating:

> Yes. It was softer in January. It was better in February, less outages. ***We're sitting ahead of the mid-singles right now.***
>
> We're -- like everybody, don't know where the world is going to go over the next 30 days with all that's going on. ***And so we're just being a little tepid about how we look at things. It doesn't really move the needle much.*** The biggest revenue driver is annualization of new stores and new stores getting added.
>
> So it gets a lot of talk track and it is important to the underlying health of the business, but ***it's really not that financially meaningful right now as fast as we're growing the top line.*** That's why we don't -- we try not to overthink it.

(Emphasis added).

70.     However, the statements identified above were materially false and misleading when made and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Dutch Bros failed to disclose to investors that: (a) the Company was experiencing increased costs and expenses and supply chain issues; and (b) as a result, the Company was experiencing increased margin pressure and decreased profitability in the first quarter of 2022.

71.     On March 11, 2022, the Company filed its annual report for the fiscal year ended December 31, 2021 on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K touted the Company's success in keeping up with supply chain issues, stating, in relevant part:

> We have taken several steps to increase our diversity of supply and reduce transportation costs as we expand company-operated shops eastward within the United States. We are finalizing the economics of our plan to build a second

roasting facility in the Midwest United States. We anticipate the new roasting facility will be operational in 2023, and will cost approximately $15 million - $20 million.

We designed our supply chain to be flexible in order to respond efficiently to changes in the market. On average, we typically have approximately four months of green coffee bean inventory stored at our two ports of entry in the United States or at our roasting plant in Grants Pass, Oregon. In the event of a supply disruption in any one of our production origins, we have identified alternate coffee beans with substantially similar flavor profiles that can be sourced and incorporated to produce our blend. . . .

72.     Individual Defendants Ricci, Boersma, Jemley, Broader, Davis, Esserman, George, Gillett, and Jack signed the 2021 10-K.

73.     These statements in the 2021 10-K were materially false and misleading when made and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Company failed to disclose that: (a) the Company was experiencing increased costs and expenses and supply chain issues; and (b) as a result, the Company was experiencing increased margin pressure and decreased profitability in the first quarter of 2022.

74.     Then, on April 21, 2022, the Company filed its annual proxy statement with the SEC (the "2022 Proxy Statement"). The 2022 Proxy Statement discussed the Company's compliance efforts, stating, in relevant part:

One of the Board's key functions is informed oversight of Dutch Bros' risk management processes. The Board and Audit and Risk Committee of the Board administer risk oversight functions to address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including determining the nature and level of risk appropriate for us. Our Audit and Risk Committee is responsible for considering and discussing our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including the guidelines and policies governing the process by which risk assessment and management is undertaken. The Audit and Risk Committee monitors compliance with legal and regulatory requirements and oversees the performance of our internal audit function. The Audit and Risk Committee is also responsible for overseeing cybersecurity risk management, and, to that end, the committee periodically reviews and discusses with management risks relating to data privacy, technology,

and information security, including cybersecurity and backup of information systems, and the steps we have taken to monitor and control such risks.

Our Audit and Risk Committee monitors the effectiveness of our Code of Business Conduct and Ethics, including whether they are successful in preventing illegal or improper liability-creating conduct. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Typically, the entire Board meets with the head of our risk management group at least annually, and the applicable Board committees meet at least annually with the employees responsible for risk management in the committees' respective areas of oversight. Both the Board as a whole and the various standing committees receive periodic reports from the head of risk management, as well as incidental reports as matters may arise. It is the responsibility of the committee chairs to report findings regarding material risk exposures to the Board as quickly as possible.

75.     However, the statements in the 2022 Proxy Statement were materially false and misleading when made because it misleadingly stated that the Company maintained adequate internal controls, including with respect to the Board's Audit and Risk Committee's oversight function. Furthermore, the 2022 Proxy Statement failed to disclose that: (a) the Company was experiencing increased costs and expenses in operating its business; and (b) as a result, the Company was experiencing increased margin pressure and decreased profitability in the first quarter of 2022.

76.     Due to the foregoing, the Company's public statements concerning Dutch Bros financial condition and prospects were materially false and misleading at all relevant times.

***The Truth Emerges***

77.      The truth began to emerge on May 11, 2022, when, after the market closed, the Company issued the 1Q22 Press Release, announcing its financial results for the first quarter of 2022. The 1Q22 Press Release revealed that Dutch Bros sustained a net loss of $16.3 million in the first quarter of 2022, compared to a net loss of $4.8 million for the first quarter of 2021. Furthermore, the Company revealed that the adjusted net loss was $2.5 million, or $0.02 per share,

for the first quarter of 2022.

78.     Furthermore, Defendant Ricci admitted to the halt in financial growth during 2022

in the 1Q22 Press Release, stating, in relevant part:

> Joth Ricci, Chief Executive Officer and President of Dutch Bros Inc., stated, "The consumer demand for our beverages remains strong. Our substantial top-line revenue growth of 54% was primarily driven by the 107 company-operated shops opened over the past twelve months, a 56% increase, including 34 during the first quarter, and same shop sales of 6.0%. As a people-led growth story, we are particularly encouraged by our staffing levels and the performance of our newest shops, spread across many markets, including some that generated record initial sales. Our ability to increase revenues while successfully developing new shops reinforces our commitment to offering exceptional drive-thru experiences and confidence in our long-term strategy and growth targets."
>
> **He added, "Still, we were not immune to the record inflation that surpassed our expectations and pressured margins in our company-operated shops. While we believe these margin impacts may be short-term, we have opted to take a more conservative stance regarding adjusted EBITDA for 2022 as we monitor our pricing and the escalating cost environment."**

(Emphasis added).

79.     Moreover, the Company provided a revised financial outlook for 2022. The 1Q22

Press Release stated:

> **Outlook**
>
> For full year 2022, Dutch Bros is providing the following outlook:
>
> • **Total system shop openings** are now expected to increase to at least 130, of which at least 110 shops will be company-operated.
>
> • **Total revenues** are projected to remain in the range of $700 million to $715 million, reflecting our continued expansion in shop openings.
>
> • **Same shop sales** growth is now estimated to be approximately flat.
>
> • **Adjusted EBITDA** is now estimated to be at least $90 million, reflecting near-term margin pressure in our company-operated shops and our decision to take modest price increases during the year.
>
> • **Capital expenditures** are still estimated to be in the range of $175 million and

$200 million, which includes approximately $15 million to $20 million for our new roasting facility that we project will open in 2023.

For Q2 2022, Dutch Bros is providing the following outlook:

• **Total shop openings** are expected to be at least 30, of which nearly all shops will be company-operated.

• **Same shop sales** are estimated to be flat to slightly negative as we face macro-economic headwinds impacting consumer discretionary income and gas prices. April same shop sales were (3.7)% in 2022 compared to 22.6% in 2021, our largest rollover of the year.

80.    On the same day, the Company held a conference call to discuss the financial results for the first quarter of 2022 (the "1Q22 Conference Call"). The Company's officers addressed the disappointing financial results for the first quarter during the 1Q22 Conference Call. For instance, Defendant Ricci stated, in relevant part:

The first quarter represented another building block in our long-term growth and value creation story. We remain focused on our disciplined growth strategy, utilizing strategic sales transfer to create great customer and Broista experiences. Our reception in new markets continues to be outstanding and the strength of the brand across geographies and doors. While we are pleased with the strength of our revenue in shop development in the first quarter, *margin pressure on our company shops led to a lower adjusted EBITDA result than we expected.*

*That margin pressure was primarily a result of these factors: our decision to be disciplined on the price we took, which we believe is less than half as much as many of our peers; faster inflation and cost of goods, especially in dairy; the pull forward of deferred expenses related to the maintenance of shops; and normal new store inefficiency amplified by the volume of new and ramping units in quarter 1.* It is important to always recognize that Dutch Bros story is all about long-term sustainable growth. Everything we do inside the company is focused on making the business better and stronger 3, 5 and 10 years from today. Unfortunately, in this past quarter, a confluence of cost pressures overwhelmed our decisions around price and resulted in near-term margin compression.

*We anticipated higher expenditures. However, we did not perceive the speed and magnitude of cost escalation within the quarter. Dairy, for example, which makes up 28% of our commodity basket, rose almost 25% in Q1.* While costs rose throughout the quarter, we experienced a change in sales trajectory from mid-March onward as macroeconomic headwinds accelerated and comps turned negative.

> We are monitoring these factors and have chosen to take a more conservative stance on our 2022 outlook given macroeconomic uncertainty. But importantly, as time passes, we have a greater and greater confidence in the growth potential based on the performance of our new units in both established and new markets. ***Our labor margin remained elevated in Q1 relative to Q4 but down slightly from the first quarter of last year***. Importantly, as we mentioned in Q4, our operations are not being impacted by staffing shortages.

(Emphasis added).

81.     Defendant Ricci went on to state that "[b]ased upon a revised cost forecast, we are taking a more conservative stance in our 2022 annual outlook and for adjusted EBITDA."

82.     Defendant Jemley also provided remarks on the financials for the first quarter of 2022, stating, in relevant part:

> As Joth noted, dairy increased by almost 25% toward the end of the first quarter to near historic highs in what is now 28% of our ingredients cost basket. We did not anticipate this sharp rise. While we do not believe dairy will stay this high indefinitely, we have to assume it will remain high for most of 2022. Additionally, we encountered 240 basis points of cost pressure on our labor line.

> This includes higher training costs, higher overtime to keep stores open, and higher legislated minimum wage advances in California, Arizona and Washington states. We continue to see stability in our workforce despite a slight uptick in turnover in the first quarter. The good news is that our stores are staffed and operating at full hours. The combination of margin pressure from ingredient costs and higher labor costs resulted in margin compression of 720 basis points prior to offsets we achieved through menu price increases.

83.     Furthermore, Defendant Jemley commented on the pricing increases for products and its effect on the Company, stating:

> Inflation in both ingredient and operating costs has risen rapidly, catching us offguard from the speed and the sharpness of this rise.

> In the short term, it is unlikely that our new menu price actions will fully offset the extent of these input cost increases. We believe outsized menu price moves in the face of consumer discretionary spending headwinds would not be wise at this stage. For our high-growth brands, the lifetime value of each customer is heightened. It is our desire to keep our menu prices approachable for customers across the income spectrum.

> Given the unexpected speed and magnitude of these costs and consumer demand events, we are taking a more conservative view of 2022 adjusted EBITDA and same shop sales. However, given the strength of our openings and their attractive returns, we are modestly accelerating new shop development to that end for full year 2022.

84.     Defendant Jemley also discussed the sales for the first quarter of 2022, stating "[s]ame shop sales are estimated to be flat to slightly negative as we face macroeconomic headwinds impacting consumer discretionary income. April same shop sales were negative 3.7% in 2022 compared to plus 22.6% in 2021, our largest rollover of the year."

85.     On this news, Dutch Bros' stock price dropped $9.26 per share, or approximately 27%, to close at $25.11 per share on May 12, 2022.

**Insider Sales**

86.     During the Relevant Period, while Dutch Bros' stock price was artificially inflated due to the Individual Defendants false and misleading statements, Defendants Ricci, Jemley, and Maxwell took advantage of the inflated stock price by engaging in insider sales for proceeds of more than $10 million..

87.     During the Relevant Period, Defendant Ricci sold a total of 142,250 shares  of his Company stock for proceeds of $6,298,118.75. Defendant Ricci made the following sales of Dutch Bros stock:

| Date | Number of Shares | Average Price Per Share | Total Transaction |
|---|---|---|---|
| March 7, 2022 | 71,125 | $46.08 | $3,277,440.00 |
| May 9, 2022 | 71,125 | $42.47 | $3,020,678.75 |

88.     During the Relevant Period, Defendant Jemley sold a total of 20,000 shares of his Company stock for proceeds of $1,001,950.00. Defendant Jemley made the following sales of Dutch Bros stock:

| Date | Number of Shares | Average Price Per Share | Total Transaction |
|---|---|---|---|

| March 15, 2022 | 15,000 | $48.77 | $731,550.00 |
| April 5, 2022 | 5,000 | $54.08 | $270,400.00 |

89.     During the Relevant Period, Defendant Maxwell sold a total of 60,000 shares of his

Company stock for proceeds of $3,005,400.00. Defendant Maxwell made the following sales of

Dutch Bros stock:

| Date | Number of Shares | Average Price Per Share | Total Transaction |
|---|---|---|---|
| March 15, 2022 | 12,000 | $48.75 | $585,000.00 |
| March 29, 2022 | 12,000 | $60.44 | $725,280.00 |
| April 12, 2022 | 12,000 | $52.57 | $630,840.00 |
| April 26, 2022 | 12,000 | $48.06 | $576,720.00 |
| May 10, 2022 | 12,000 | $40.63 | $487,560.00 |

90.     As a direct and proximate result of the Individual Defendants' misconduct, the

Company has incurred significant financial losses, including the costs of defending itself in the

Securities Action, exposure to class-wide liability in the Securities Action, as well as additional

losses, including reputational harm and loss of goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91.     Plaintiff brings this action derivatively in the right and for the benefit of the

Company to redress injuries suffered and to be suffered as a direct and proximate result of the

breaches of fiduciary duties by the Individual Defendants.

92.     Dutch Bros is named solely as a nominal party in this action.  This is not a collusive

action to confer jurisdiction on this Court that it would otherwise not have.

93.     Plaintiff is a current shareholder of Dutch Bros and was a continuous shareholder

of the Company during the period of the Individual Defendants' wrongdoing alleged herein.

Plaintiff will adequately and fairly represent the interests of the Company in enforcing and

prosecuting its rights and retained counsel competent and experienced in derivative litigation.

94.     A pre-suit demand on the Board is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company, the Board consisted of Defendants Ricci, Boersma, Broader, Davis, Esserman, George, Gillett, and Jack.

95.     At the time this action was commenced, the seven-person Board was comprised of Defendants Ricci, Boersma, Broader, Davis, Esserman, George, Gillet, and Jack (the "Director Defendants") and non-party Ann Miller ("Miller"), who joined the Board in August 2022. Plaintiff did not make any demand on the Board to institute this action because such a demand would be futile, wasteful, and useless act, as set forth below.

96.     A pre-suit demand on the Board would be futile as there is a reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the seven current directors of Dutch Bros are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

97.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

98.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence, disregarded the wrongs complained of herein, and are, therefore, not disinterested parties.

99.     Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized

and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute sch a suit even if they instituted it.

100.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

101.    Individual Defendant Ricci is not disinterested or independent. Defendant Ricci is CEO of the Company, and he derives substantial compensation from his relationship with the Company. Moreover, Defendant Ricci was directly involved in and perpetrated the scheme described above. Furthermore, Defendant Ricci took advantage of the artificially inflated stock price during the Relevant Period, netting over $6 million in proceeds from his insider sales. Defendant Ricci has also been named as a defendant in the Securities Action. As a result, Defendant Ricci breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested.

102.    Individual Defendant Boersma is not disinterested or independent. Defendant Boersma is co-founder and Executive Chairman of the Company, and he derives substantial compensation from his relationship with the Company. Moreover, Boersma was directly involved in and perpetrated the scheme above. Furthermore, Defendant Boersma and his affiliates own approximately 75.8% of the voting power of Dutch Bros. Thus, Defendant Boersma is not independent or disinterested.

103.    The Audit Defendants are not disinterested or independent. The purpose of the Audit Committee is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements.

Therefore, the Audit Defendants knowingly or recklessly allowed the aforementioned improper statements.

104.    Significantly, the Director Defendants have taken no remedial action to redress the conduct alleged herein. Non-party Miller has likewise taken no action to correct this misconduct.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act and Rule 10b-5

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

107.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with her purchases of Dutch Bros common stock.

109.    The Individual Defendants acted with scienter because they (a) knew that the public documents and statements issued or disseminated in the name of Dutch Bros were materially false

and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

110.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Dutch Bros, their control over, and/or receipt and/or modification of Dutch Bros' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Dutch Bros, participated in the fraudulent scheme alleged herein.

111.    As a result of the foregoing, the market price of Dutch Bros common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff, relied on the statements described above and/or the integrity of the market price of Dutch Bros common stock in purchasing Dutch Bros common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

112.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against the Individual Defendants
### for Breach of Fiduciary Duty

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

115.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

116.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

117.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

118.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

image and goodwill. Such damage includes, among other things, costs incurred in defending itself

in the Securities Action, exposing the Company to millions of dollars in potential class-wide

damages in the Securities Action, and damage to the share price of the Company's stock, resulting

in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

119.     Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

120.     By encouraging and accomplishing the illegal and improper transactions alleged

herein and concealing them from the public, the Individual Defendants have each encouraged,

facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual

Defendants have each aided and abetted, conspired, and schemed with one another to breach their

fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal

conduct complained of herein.

121.     Plaintiff on behalf of Dutch Bros has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants
### for Unjust Enrichment

122.     Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

123.     By their wrongful acts, violations of law, and false and misleading statements and

omissions of material fact that they made and/or caused to be made, the Individual Defendants

were unjustly enriched at the expense of, and to the detriment of, Dutch Bros.

124.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Dutch Bros that was tied to the performance or artificially inflated valuation of Dutch Bros, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

125.    In addition, Defendants Ricci, Jemley, and Maxwell  were unjustly enriched through their insider sales of Company stock while in possession of undisclosed, non-public information concerning Dutch Bros true financial condition and business prospects as alleged above.

126.    Plaintiff, as a shareholder and a representative of Dutch Bros, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

127.    Plaintiff on behalf of Dutch Bros has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants
### for Waste of Corporate Assets

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

130.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (a) paying and colleting excessive compensation and bonuses; and

(b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

131.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

132.    Plaintiff on behalf Dutch Bros has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 18, 2023

**RIGRODSKY LAW, P.A.**

By:   */s/ Timothy J. MacFall*
   Seth D. Rigrodsky
   Timothy J. MacFall
**OF COUNSEL:**      Gina M. Serra
   Vincent A. Licata
**GRABAR LAW OFFICE**   825 East Gate Boulevard, Suite 300
Joshua H. Grabar (#5906953)  Garden City, NY 11530
One Liberty Place     Telephone: (516) 683-3516
1650 Market Street, Suite 3600  Email: sdr@rl-legal.com
Philadelphia, PA 19103    Email: tjm@rl-legal.com
Telephone: 267-507-6085   Email: gms@rl-legal.com
Email: jgrabar@grabarlaw.com  Email: vl@rl-legal.com

   *Attorneys for Plaintiff*